BOARD OF COUNTY COMMISSIONERS OF PRINCE
GEORGE'S COUNTY, MARYLAND ET AL. *v.*
OAK HILL FARMS, INC.

[No. 4, September Term, 1963 (Adv.).]

*Decided July 12, 1963.*

The cause was argued before the full Court.

*Russell W. Shipley,* with whom were *Robert B. Mathias, Lionell M. Lockhart* and *Joseph S. Casula* on the brief, for the Board of County Commissioners, one of the appellants.

*Hal C. B. Clagett,* with whom were *Sasscer, Clagett & Powers* on the brief, for the protestants of the rezoning, the other appellants.

*Blair H. Smith* and *Charles T. Finley* for the appellee.

HAMMOND, J., delivered the opinion of the Court.

The Circuit Court for Prince George's County reversed the action of the County Commissioners of that County, acting as a District Council, in refusing to rezone some twenty-one acres of land for use for high density apartments, and directed approval of the petitions which sought reclassification.

The County Commissioners and aggrieved neighbors have appealed, claiming that (a) there was evidence before the District Council upon which its decision not to rezone reasonably could have been based; (b) this being so, the court could reverse or modify the decision only "if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are * * * (6) against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency * * *," to use the language of the applicable statute governing appeals, Ch. 780 of the Laws of 1959, Sec. 79 (i) (6); [1] and (c) the grant of power to the Circuit Court to weigh the evidence on which the District Council acted is an unconstitutional delegation of legislative police power to the judicial arm of the government.

The constitutional question here posed was raised as to the statute applicable to Prince George's County which preceded Sec. 79 (i) of Ch. 780 of the Laws of 1959 (and was identical as to the seven grounds on which the Circuit Court could reverse or modify the action of the District Council) in *Prince George's County v. Donohoe,* 220 Md. 362, 371, 372, but was not decided because that case was remanded on another ground. The *Donohoe* opinion pointed out that there was nothing new or novel in the provision that reversal or modification could be predicated by the court on a finding that the Council's "findings, inferences, conclusions, or decisions are * * * (5) unsupported by competent, material and substantial evidence in view of the entire record as submitted * * *" (or

---

1. Sec. 79 (e) authorizes appeals from the District Council whether its action is affirmative or negative, and Sec. 79 (i) spells out seven instances in which the decision appealed from is to be reversed or modified.

of the other reasons set out in Sec. 79 (i) with the exception of the provision as to the weight of the evidence).[2] Chief Judge Brune said for the Court:

"No question is raised as to the validity of the power of the court to reverse or remand for any of the grounds which we have numbered (1) to (5), inclusive, or (7). Even though Ch. 712 [of the Laws of 1957] contains no separability clause, we see no basis for striking down the statute as an entirety because of the alleged constitutional invalidity of ground (6) * * *. We find no reason to suppose that the General Assembly would not have enacted the unchallenged provisions of the Act even if those which are attacked should be declared invalid, nor do we find the challenged provisions to be inseparably connected with those which are concededly valid."

The provisions of Sec. 79 (i) were referred to, but not construed, in *Board of County Commissioners v. Walcroft*, 224 Md. 610.

In the view we take of the present appeal, again we do not need to determine the validity of the legislative grant to the court of the power to weigh the evidence before the District Council. We think the "findings, inferences, conclusions or decisions" of the Council were "unsupported by competent, material and substantial evidence in view of the entire record * * *."

The land here in question is but a short distance from the District of Columbia line on the south side of Naylor Road at its intersection with Branch Avenue (Maryland Route 5). The land was originally zoned rural residential. In 1949, with the adoption of the 1949 Zoning Map, a parcel fronting on Naylor Road was zoned C-1 (local commercial). In 1950 the remainder of the twenty-one acres was changed to R-18

2. These other provisions are: "(1) in violation of constitutional provisions; or (2) in excess of the statutory authority or jurisdiction of the agency; or (3) made upon unlawful procedure; or (4) affected by other error of law; * * * or (7) arbitrary or capricious."

(multiple family, medium density residential) zoning. There-
after, the Maryland-National Capital Park and Planning Com-
mission initiated proceedings to reclassify the land, other than
the C-1 part, to R-35 (semi-detached residential), and it was
so rezoned. None of the land has been developed or built on.
The land slopes upward to the west from Branch Avenue to
a ridge line which once was the peak of a very high hill from
which thousands of tons of gravel and sand have been re-
moved. The elevation is still high in relation to abutting and
surrounding properties. Other parts of the tract also are high,
the whole area being composed of steep hills and high rolling
terrain.

Along both Branch Avenue and Naylor Road the land is
zoned C-1 and C-2 (general commercial), and is so utilized,
with R-35 zoning to the southeast, R-55 to the south, R-18
to the west, and R-55 to the northwest.

There have been many changes to commercial zoning, and
actual commercial uses, in the neighborhood since the last com-
prehensive zoning plan was adopted in 1949. There are some
one hundred thirty-five acres of commercially zoned land in
the area surrounding the land here involved. These marked
changes in the neighborhood are expressly conceded by the
appellants.

The Council had before it the report of the technical staff
of the Planning Commission which recommended denial of the
requested rezoning because a tentative master plan for the
area, which the staff had prepared but which had not been
adopted (and never was adopted, as proposed), did not con-
template the use of the land for intense residential develop-
ment. The Planning Commission rejected the staff recom-
mendation and reported unanimously to the Council that it
believed "that the reclassification of the subject properties to
the R-10 zone would provide the best possible use of these
properties," that, in its opinion, a mistake had been made in
last rezoning the land along Naylor Road to commercial
and the rest of the land to R-35, and that it had been "com-
pelled to the conclusion that the rezoning of the properties
in question to the R-10 zone would have a tendency to stabilize
the area and make for better land use."

The applicants produced a number of acknowledged experts whose testimony was that there had been many material changes since the original zoning in 1949, that there was a strong need for high density land use to meet demand for housing facilities and to provide needed customers for the many adjacent and nearby commercial establishments, that the great impracticability of using the land either for commercial use or for R-35 housing was manifest because of the nature of the terrain and the tremendous cost of removing dirt to permit construction which could be justified and supported financially only by high density residential use of the land as levelled, and that there was a real improbability, if not impossibility, of financing R-35 housing on the property. In sum, the opinion of the experts, unchallenged by any probative testimony, was that the best (and the only feasible) use of the land was for high rise apartments and that this use would be in harmony with the present character and planned future of the neighboring area and would not deteriorate the value of adjacent or nearby homes or otherwise adversely affect the welfare, health or safety of the community.

The protestants did not wish apartments built because the country-like atmosphere they had sought and enjoyed would be spoiled, and for aesthetic reasons. They supported their objections by arguing that overcrowding of schools would result if the apartments were built, roads would be congested and water and sewage problems compounded. These rationalizations, on attempted factual grounds, of the very natural objections of homeowners to the depressing effects of the inevitable push towards a place to live of a vastly increased population, were completely rebutted by the facts brought out by the experts. (For example, the expert answer, proved by experience, to the school overcrowding argument was that the proposed "high rise" apartments would add 104 children to the school population, while the number of school children in R-35 homes would be 205.)

Judge Loveless found that "the technical staff report has no real merit in opposing the rezoning * * *" and that the testimony offered by the protesting neighbors amounted only

to unsupported conclusions which he characterized, we think not inaccurately, as "opposition without evidence." He said: "On the other hand, the petitioners presented testimony of acknowledged experts on land use, planning and development. The conclusions of the opposition as to roads, traffic, schools and property values were completely rebutted by these experts with studies, surveys, examples * * *."

He concluded the refusal of the Council to rezone was a yielding to demonstrated displeasure at the prospect of many and vocal protestants, was against the weight of the evidence, unsupported by substantial evidence and arbitrary and capricious. We agree with his finding of unsubstantiality of evidence and with his conclusion as to arbitrariness and capriciousness.

In *Universal Camera Corp. v. National Labor Relations Board,* 340 U. S. 474, 95 L. Ed. 456, Justice Frankfurter, for the Supreme Court, reviewed the evolution of the substantial evidence rule in federal administrative law into the rule of "substantial evidence on the record considered as a whole" and construed the meaning of the quoted phrase. He pointed out that substantial evidence had been held to mean more than a scintilla and was such evidence "as a reasonable mind might accept as adequate to support a conclusion * * * and enough to justify, if the trial were to a jury, a refusal to direct a verdict * * *."[3] Cf. *Snowden v. Mayor and City Council,* 224 Md. 443, in which we discussed and applied the substantial evidence rule in an appeal from the Board of Municipal and Zoning Appeals of Baltimore.[4] Justice Frankfurter said that

3. Professor Jaffe suggests that the standard of a "reasoning" mind would be sounder, better and more precise than that of a "reasonable" mind. Jaffe, Judicial Review: Question of Fact, 69 Harvard L. Rev. 1020, 1021-1022.

4. We said in Snowden (at p. 445 of 224 Md.): "The judicial function in appeals from an administrative agency is well established and defined. The court will correct illegal actions and those which are arbitrary and unreasonable because they are not based on substantial evidence but it will not substitute its own independent examination of or its own judgment on the facts for those of the agency to which the carrying out of state policy has been delegated."

the "very smoothness of the 'substantial evidence' formula as the standard * * *" had induced the reviewing courts to affirm the agency if there was, in the record, evidence which "when viewed in isolation," substantiated the administrative finding. Criticism of this practice and its results fast grew to a point where change was imperative. The Attorney General of the United States named a committee of highly qualified men, fully familiar with the field, to recommend a remedy.

The final report of the committee, which is referred to in *Universal Camera,* was submitted in January 1941. The majority concluded that the line between "substantial evidence" and "weight of evidence" is not easily drawn and that the wisdom of a general change to a review of the "weight of evidence" was questionable. Departure from the "substantial evidence" test, the majority thought, would either create unnecessary uncertainty or transfer to the courts the responsibility for ascertaining and assaying matters the significance of which lies outside judicial competence. The minority of three of the committee—Dean Stason, Dean Vanderbilt, and Mr. McFarland, Chairman of the American Bar Association Committee on Administrative Law — recommended that the existing practice of the reviewing courts (to read only one side of the case and, if any evidence is there found, to sustain the administrative action, while ignoring the record to the contrary) be curbed by requiring that the review extend to "findings, inferences or conclusions of fact unsupported, upon the whole record, by substantial evidence." The opinion in *Universal Camera* (at p. 482 of 340 U. S.) says: "So far as the history of this movement for enlarged review reveals, the phrase 'upon the whole record' makes its first appearance in the recommendation of the minority of the Attorney General's Committee." [5]

---

5. Professor Jaffe thinks that the phrase "upon the whole record" came from the language of Judge Lehman, for the Court, in Stork Restaurant, Inc. v. Boland, 282 N. Y. 256, 26 N. E. 2d 247, 256. Referring to the federal Administrative Procedure Act and the Taft-Hartley Act, he said: "This may have been the source of the whole record phrase in the statutes we are now considering." Jaffe, Judicial Review: Question of Fact, 69 Harvard L. Rev. 1020, 1026.

The Administrative Procedure Act and the Taft-Hartley Act, which Congress enacted following the report of the committee, required the court to review the whole record to determine if the administrative action was unsupported by substantial evidence. *Universal Camera* held that if it ever was permissible for a court to determine substantiality merely on evidence, which of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, "the new legislation definitely precludes such a theory of review and bars its practice" for the reason that "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement * * * that courts consider the whole record." The new requirement was held not to mean that the court could displace the agency's choice between two fairly conflicting views "even though the court would justifiably have made a different choice had the matter been before it de novo." The new duty meant, the opinion said (340 U. S. 474, 488), that "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

The holding of the Supreme Court that in determining substantiality of evidence there must be taken into account whatever in the record fairly detracts from its *weight* emphasizes the observation that there is a thin line between a test based on substantial evidence and one based on weight of evidence. Some statutes or rules have directed the courts to pass on the weight of evidence in administrative appeals, and courts have followed the direction in a number of decisions, federal and state, without feeling that they were exercising an impermissible nonjudicial function in asserting and exercising the power to ascertain whether agency findings are in error because clearly erroneous or against the weight of the evidence or the clear or the manifest weight of the evidence. 2 Am. Jur. 2d, *Administrative Law,* Secs. 661, 681, 682. See also 4 Davis,

*Administrative Law,* Secs. 29.08, 29.09, and Jaffe, *Judicial Review: Question of Fact,* 69 Harvard L. Rev. 1020, 1052, *et seq.*[6]

Whether the test of substantial evidence on the entire record or the test of against the weight of all the evidence is followed, the courts have exercised restraint so as not to substitute their judgments for that of the agency and not to choose between equally permissible inferences or make independent determinations of fact, because to do so would be exercising a nonjudicial role. Rather, they have attempted to decide whether a reasoning mind could reasonably have reached the result the agency reached upon a fair consideration of the fact picture painted by the entire record.

In the cases dealing with consideration of the weight of the evidence, the matter seems to have come down to whether, all that was before the agency considered, its action was clearly erroneous or, to use the phrase which has become standard in Maryland zoning cases, not fairly debatable.[7] 73 *C. J. S. Public Administrative Bodies and Procedure,* Sec. 225.

As we have noted, the line between the test of substantiality of evidence on the whole record and that of the weight of the evidence is thin and difficult to delineate. Kramer, *The Place and Function of Judicial Review in the Administrative Process,* 28 Fordham Law Rev. 1, 74-84. *Cf.* Jaffe, *Judicial Review:*

---

6. General Foods Corp. v. Brannan (7th Cir.), 170 F. 2d 220, 223, 224; G. H. Miller & Co. v. United States (7th Cir.), 260 F. 2d 286, 288; F. C. C. v. Allentown Broadcasting Corp., 349 U. S. 358, 99 L. Ed. 1147. Cf. Wright-Bernet, Inc. v. Commissioner (6th Cir.), 172 F. 2d 343; Aetna Life Insurance Co. v. Newark (N. J.), 89 A. 2d 385, 387 (construing Rule 4:88-13, then Rule 3.81-13); In re New Jersey Power & Light Co. (N. J.), 89 A. 2d 26, 31; Parker v. Department of Registration and Education (Ill.), 125 N. E. 2d 494, 496, 497; Drezner v. Civil Service Commission (Ill.), 75 N. E. 2d 303, 307; Southern Railway System v. Public Utilities Comm. (Ohio), 141 N. E. 2d 149, 150; Atlantic Coast Line R. Co. v. Public Service Comm. (S. C.), 81 S. E. 2d 357, 358; Manlowe Transfer & D. Co. v. Department of Public Service (Wash.), 140 P. 2d 287, 288; Worley v. Swift & Co. (Kansas City Ct. of Appeals, Mo.), 231 S. W. 2d 828, 831, 832.

7. See the cases cited in footnote 6.

*"Substantial Evidence on the Whole Record,"* 64 Harvard L. Rev. 1233, 1245-6, and *Snowden v. Mayor and City Council,* 224 Md. 443 (cited above).

Bringing the applicable theory of law to bear on the facts of the case before us, we think the whole record compels the conclusion that Judge Loveless was right in holding that the action of the District Council was unsupported by competent, material and substantial evidence and, therefore, was arbitrary and capricious. The only such evidence which possibly could support the refusal to rezone the property was the report of the technical staff and, then, only "when viewed in isolation," without regard to proof to the contrary. The staff report dealt largely in abstractions without meaningful specifics, being largely a plea for placing high values on master plans and, therefore, for not disturbing a classification the staff contemplated for the property in recommending to the Commission a proposed master plan. The staff said the purpose of a master plan (and thus of their plan for the area) "is to provide a land use pattern upon which to base future zoning, land use, public facilities and private services and arrange these in such a manner that (sic) would result in an efficient and well-balanced community. * * * The resulting proposals are, in the judgment of the staff, the most logical and beneficial manner in which the area can develop. * * * The staff can find no justification for the revision of its proposals for these properties. It therefore becomes necessary for the applicant to prove that the requested reclassification is in the public interest, more so than the present zoning classifications as reflected in the Henson Creek Watershed Master Plan."

The staff's concept of a comprehensive zoning plan overlooked an important element. We said in *Huff v. Board of Zoning Appeals,* 214 Md. 48, 58, 59, that a comprehensive plan should seek to accomplish, as far as possible, the most appropriate uses of land, consistent not only with the public interest but also with the safeguarding of the interests of the individual property owner. The Planning Commission, in recognition of all the elements of a proper comprehensive

plan, rejected the staff's recommendation and, in so doing, by its findings that R-10 zoning would provide the best possible use of the property, stabilize the area and make for better land use, lessened, if it did not nullify, the force of the staff's adherence to its own proposed master plan, under incomplete standards.

In addition, the proponents of the rezoning to R-10 met the challenge of the staff's report that the burden was upon them to prove that the requested reclassification would be in the public interest to a greater extent than the existing classification which the staff sought to perpetuate. The testimony of the experts in behalf of the applicants for change, to which no answer was given by the objectors, left no real doubt that the public interests, as well as the interests of the owner of the land on which the apartments would be built, would best be served by the rezoning. There was nothing left in the record to support the District Council's action.

*Order affirmed, with costs.*