## PARK CONSTRUCTION CORPORATION *v.* BOARD OF COUNTY COMMISSIONERS FOR PRINCE GEORGE'S COUNTY, MARYLAND

[No. 133, September Term, 1966.]

598

*Decided March 9, 1967.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and FINAN, JJ.

*Martin H. Freeman,* with whom were *Jerrold V. Powers* and *Sasscer, Clagett, Powers & Channing* on the brief, for appellant.

*James J. Lombardi,* with whom were *Lionell M. Lockhart, Harry L. Durity, Joseph S. Casula* and *Martin Hertz* on the brief, for appellee.

BARNES, J., delivered the opinion of the Court.

The appellee, the Board of County Commissioners for Prince George's County, sitting as the District Council (the Board), declined to rezone two tracts of land in Prince George's County, owned by the appellant, Park Construction Corporation (Park Construction) from R-R to R-18 and from R-R to R-30 respectively. On appeal to the Circuit Court for Prince George's County, Judge Bowie affirmed the action of the Board and dismissed Park Construction's petition for appeal. From this order, Park Construction has appealed to this Court. We have con-

cluded that the lower court's ruling was correct and the order of that court will be affirmed.

The subject property consists of two irregularly shaped parcels of land for which two separate rezoning petitions were filed. The land involved in Petition A-5609 consists of 61.3852 acres, for part of which rezoning was requested from R-R (rural residential-single-family dwellings) to R-18 (multiple-family, medium density, residential). The land involved in Petition A-5610 consists of 19.2790 acres of land, bordering in part the 61.3852 acre tract involved in Petition A-5609. The rezoning requested for part of the 19.2790 acre tract is from R-R to R-30 (multiple-family, low density, residential). The whole development is called "Cherryvale."

Simplifying somewhat the shape of the two irregular tracts (the subject property), it forms a triangle, the base of which extends along the southeast side of the property and the apex of which is at the northwest. The land is bounded generally on the north and northeast by the High Point High School property, on the northwest by Powder Mill Road; on the west by a tract owned by Park Construction, sandwiched between the subject property and Cherry Hill Road;[1] on the southwest by an elementary school site; on the south by Selman Road; and on the southeast by a 250 foot right-of-way of the Potomac Electric Power Company (Pepco).

West of the subject property, across Cherry Hill Road, is Powder Mill Estates, a development of single-family residences. On the south side of Selman Road is the United States Agricultural Research Center.

A plat introduced into evidence before the Board, shows an area 300 feet wide, cutting through the southeastern end of the subject property, approximately parallel to the Pepco right-of-way. This area was identified in the testimony as the proposed location of Interstate Highway I-95.

A Sinclair Refining Company right-of-way, 33 feet wide,

---

1. The eastern portion of this rectangular tract, bordering the subject property, is a green space buffer, which will remain clear except for access streets. Four single-family houses have already been built on the western portion of the tract, facing Cherry Hill Road, and other such houses are planned for this portion.

runs through the 61.3852 acre tract in an east-southeast direction approximately through the center of that tract.

The net area for which rezoning to R-18 is desired in Petition A-5609 (the 61.3852 acre tract) is 37.2752 acres, less acreage to be dedicated for access roads and the net area for which rezoning to R-30 is desired in Petition A-5610 (the 19.-2790 acre tract) is 16.669 acres, less acreage to be dedicated for access roads.

The Technical Staff of the Maryland National Capital Park and Planning Commission (Planning Commission) approved Park Construction's plans and recommended the approval of its two petitions for rezoning. The Technical Staff's Amended Report, dated January 27, 1965, indicates that the Staff had re-evaluated the area and concluded that the proposed rezoning should be approved for the following reasons:

"1. There is evidence of a change in the character of the general area towards more intensive residential land use;

"2. A staff study, which re-evaluated the area, reveals that more intensive residential development can be reasonably permitted providing existing single-family development is protected and buffered;

"3. Adjacent elements (a high school, and elementary school, R-18 zoning and I-95) are compatible to more intensive residential use of the subject properties."

The Planning Commission adopted the recommendations of the Technical Staff and ultimately passed resolutions approving the rezoning for the net areas desired by Park Construction, less the acreage to be dedicated for access roads.

At the hearing before the Board on August 4, 1965, the report of the Technical Staff and the Resolutions of the Planning Commission were admitted into evidence. In addition to these exhibits, Park Construction produced the testimony of Buford M. Hayden, a well qualified land design engineer and Thomas G. Oyster, a well qualified engineer and land surveyor.

Mr. Hayden after reviewing the facts and the cooperative efforts between Park Construction and the Technical Staff, gave as his expert opinion that the influence of I-95 made single-fam-

ily use of the land improper; that the proposed plans for a rapid transit station on the I-95 right-of-way or just across from it and the noise of heavy vehicles made the area undesirable for single-family development; further, that the location of the high school, and its athletic field and stands with lighting at night, should not properly be next to single-family houses; and, that the 33 foot right-of-way of the Sinclair Refining Company hindered the use of the property for single-family dwellings. Mr. Hayden believed that the subject property was properly adaptable to multiple-family use and the proposed zoning would not have a detrimental effect on single-family houses in the neighborhood because of the lack of very high density, the proposed buffer zone and the small exposure of the proposed project to single-family houses. He further testified that he was in full accord with the Planning Commission's "neighborhood concept" plans.

Mr. Oyster summarized the results of his study and planning of the subject property over a seven year period, and a letter of July 28, 1965, from the State Roads Commission to him was introduced into evidence. This letter was, in material part, as follows:

> "Thank you for your letter requesting certain information pertaining to the subject project and subject property.
>
> "This office has reviewed, with our Bureau of Planning & Programming and Special Services, the tentatives plans for I-95 in the area of Cherry Hill Road. Based on a proposed eight (8) lane bifurcated highway, the proposed Right of Way line and easement area as noted on the attached plan is correct. It is anticipated that I-95 will be under construction during the period of 1966-1970 and Right of Way acquisition therefore, will begin prior to actual construction.
>
> *"Although construction plans are being prepared at this time, both the horizontal and vertical alignments have not been established.*
>
> "As of this date no decision has been made either negative or affirmative with respect to provisions for mass transit facilities within the proposed median. Al-

though much discussion by local government agencies has taken place, none has been of the official nature. * * *." (Emphasis supplied).

Mr. Oyster testified that in his opinion the proper use of the subject property was for multiple-family use. He gave, as factors in reaching this opinion, the rights-of-way of I-95 and of the Sinclair pipeline, the impact of volume use of I-95 (80,000 to 100,000 vehicles per day, including trucks and buses), the adjacent schools and the adjacent apartments.

Philip F. Warner, who resided in Powder Mill Estates, appeared in opposition to the granting of the rezoning. He appeared not only for himself but also for the High Point Citizens' Association, composed of residents and property owners in the developments of Powder Mill Estates, Pleasant Acres and High Point Heights. He introduced into evidence a map which showed that 96% of all acreage rezoned since 1963 had been granted or was requested to be changed from the R-R zone to apartment uses and only 4% had been zoned for single-family dwellings. He indicated that 185 acres in the area already were zoned for R-18, of which only 41 acres were under construction, 20 acres occupied and 124 acres still remained undeveloped. He pointed out that there was no compelling need for more apartments in the area and that the existing single-family houses of Powder Mill Estates would not be adequately buffered or protected if the zoning was granted. Counsel for Park Construction stated to the Board that "the location of I-95 is not finally and exclusively decided." There was evidence that I-95 would be completed by 1970.

On October 13, 1965, the Board disapproved both petitions for rezoning and after describing the respective tracts, found the following facts:

> * * *
>
> "(2) That the zoning changes in the area are R-18 apartments zones which are to the north on Powder Mill Road, and to the northwest on Cherry Hill Road adjacent to the Montgomery County line. That at present, there are 184 acres of apartment zoning north

of the subject property of which only 41 acres are developed.

"(3) That the Park and Planning Commission and the Technical Staff have recommended approval of the requested rezoning based upon staff studies since the adoption of the General Plan which recommended single-family development, as adopted in January of 1964.

"(4) That the experts testifying for the applicant based their conclusions on the proposed development of I-95 which the evidence indicates will not be built for at least another five years."

The Board concluded as follows:

"* * * [T]hat while there is substantial change to apartment zoning to the north on Cherry Hill Road and Powder Mill Road, no reasons were given by the petitioner, the Park and Planning Commission, or the Technical Staff as to why 80 more acres of apartment zoning should be granted in an area where some 140 acres still are undeveloped. In view of the adoption of a Master Plan for the area as recent as one and one-half years ago which recommends single-family development, the District Council feels impelled to view with caution the extension of an 80-acre tract to an area which may be overzoned for apartments. This is especially true when the main premise justifying the rezoning is the proposed construction of an arterial highway which has not reached the acquisition stage and is at least five years away from completion.

"The District Council further concludes that even if the subject property was proposed in the Master Plan for apartment use, it would still be justified in denying the zoning application as being premature, and not being in the best interests of the orderly development of the County, as set forth in the legislative act."

On appeal to the Circuit Court for Prince George's County, Judge Bowie most reluctantly concluded that the decision of the

Board was fairly debatable and, although he personally disagreed with the Board's decision, he could not, under the decisions of this Court, substitute his opinion for the decision of the Board. In this conclusion he was correct.

In a case like the present one involving a *refusal* by a legislative body to rezone, the issue before the Court on a challenge to the Board's action is whether that action was unreasonable, arbitrary and capricious because there was no evidence legally sufficient to support its action and consequently the issue before the Board was not "fairly debatable." As we said in *Sampson Brothers (Md.), Inc. v. Board of County Commissioners of Prince George's County,* 240 Md. 116, 119-20, 213 A. 2d 289 (1965) :

> "The test is whether the action of the District Council in disapproving the applications and in *declining to reclassify* as requested in the petitions was arbitrary, unreasonable and capricious. *Muhly v. County Council for Montgomery County,* 218 Md. 543, 546, 147 A. 2d 735, 738 (1958). *Ellicott v. City of Baltimore,* 180 Md. 176, 184, 23 A. 2d 649 (1942). We have held that if the issues before the District Council are fairly debatable its action in declining to rezone is not arbitrary, unreasonable and capricious. *Muhly v. County Council for Montgomery County, supra; Conley v. Montgomery County,* 216 Md. 379, 383, 140 A. 2d 525 (1958) ; *Montgomery County v. Scrimgeour,* 211 Md. 306, 312, 127 A. 2d 528 (1956)."

We cited *Sampson Brothers* with approval in *Dobry v. Board of County Commissioners for Prince George's County,* 241 Md. 717, 216 A. 2d 746 (1966), and in *Board of County Commissioners for Prince George's County v. Farr,* 242 Md. 315, 218 A. 2d 923 (1966).

Park Construction contends that the Board's refusal to rezone was arbitrary, unreasonable and capricious because its action was not supported by competent, material or substantial evidence and hence its action was not fairly debatable. It relies principally upon our decision in *Board of County Commissioners for Prince George's County v. Oak Hill Farms, Inc.,*

232 Md. 274, 192 A. 2d 761 (1963). We think this reliance is misplaced.

In *Oak Hill Farms* there was no credible evidence to oppose the overwhelming evidence, presented by the applicant's experts, in favor of the rezoning, and the approval of the Planning Commission (which, in that case, had rejected the adverse recommendation by the Technical Staff based upon a *tentative* Master Plan which had never been adopted). The protestants gave conclusions, but no facts to support them, based upon their preference for "the country-like atmosphere they had sought * * * and for aesthetic reasons."

In the present case, however, there was substantial evidence to support the Board's refusal to rezone. To the west of the subject property, across Cherry Hill Road is a fully developed subdivision of single-family detached dwellings on one-half acre lots known as Powder Mill Estates, and to the northwest there is a 25-acre tract of single-family homes known as High Point Estates. There are four single-family homes quite near the subject property. Although the letter of July 28, 1965 from the State Roads Commission in regard to I-95 indicates that the *proposed* right-of-way and easement noted in an attached plan was "correct," it refers to the plan for I-95 as a *tentative plan,* and states that construction would be for a period from 1966 to 1970. This letter also states that right-of-way acquisition would begin before actual construction. The testimony did not indicate that at the time of the hearing, rights-of-way had been acquired. The letter also indicates that "no decisions had been made" concerning mass transit facilities. The representative of the Planning Commission testified he was not certain in regard to the firmness of the plan for the location of I-95. The Master Plan adopted in January of 1964 had recommended single-family development for the subject property. The evidence establishes that in the general area 185 acres of land had already been zoned R-18 of which acreage only 41 acres were built on and only 20 acres occupied. There remained 124 acres of R-18 land undeveloped.

We cannot say, in the light of this proof, that a reasonable man could not conclude—as the Board concluded—that there was no immediate need for additional R-18 zoning and, in

any event, that it would be premature for the Board to grant additional R-18 zoning until there had been an irrevocable decision to locate the exact right-of-way for I-95. The matter was, therefore, fairly debatable and we cannot say that the Board's action was unreasonable, arbitrary and capricious.

Under the facts, the Board might well have granted the requested R-18 zoning. As we have indicated, Judge Bowie personally thought that the Board should have granted Park Construction's application, but quite properly concluded that the lower court could not substitute its judgment for that of the Board to which the zoning and rezoning power is given by the General Assembly.

*Order affirmed, the appellant to pay the costs.*