## WELLS *v.* PIERPONT

[No. 184, September Term, 1968.]

*Decided May 27, 1969.*

The cause was argued before HAMMOND, C. J., and MARBURY, BARNES, McWILLIAMS, FINAN and SINGLEY, JJ.

*Marvin I. Singer* for appellant.

*W. Lee Harrison* for appellee.

McWILLIAMS, J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion by BARNES, J., at page 561 *infra*.

In 1918 the appellee (Pierpont) bought the northwest corner of Windsor Mill Road and Clarke Avenue in the Baltimore County suburb of Woodlawn, which is about a mile west of the western boundary of Baltimore City. Ever since then the 14 room frame house on this two and one-third acre lot (the property) has been his home. In 1965, having reached the age of 81, he sold it to a supermarket entrepreneur. Since the property was in an R-6 (Residence, One and Two-Family) zone, a condition precedent to the consummation of the sale was that Pierpont would effect the reclassification of the property from R-6 to B-L (Business-Local). In June 1965 the Zoning Commissioner denied his petition. The County Board of Appeals (Board), in September 1967, reversed the Zoning Commissioner and granted the reclassification. In May 1968 the trial judge, Maguire, J., affirmed the action of the Board.

The property was placed in the R-6 classification by the adoption of the Comprehensive Zoning Map of November 1962 (the map) which, it is conceded, contains no error. Pierpont insists,

however, that there was before the Board evidence of a substantial change in the character of the neighborhood, subsequent to the adoption of the map, sufficient to make that issue fairly debatable. Both the Board and Judge Maguire agreed with him. We do not. As we proceed to a consideration of the narrow question thus presented, one must be mindful of the relevant facts and circumstances.

The section of Windsor Mill Road with which we are concerned runs from the city line northwesterly to the Baltimore Beltway. It is an old road with only one lane of traffic in each direction. It runs downhill toward the property and then goes uphill for perhaps 1000 feet to the crest of a ridge, continuing on from there for something less than a mile to the Beltway. In 1964 Clarke Avenue was widened and renamed Woodlawn Drive. It intersects Windsor Mill Road at right angles. Judge Maguire, in his opinion, said it "is at the present time a major highway in Baltimore County."

As earlier mentioned the property lies in the northwest quadrant of the intersection. The northeast quadrant contains the playground of the Woodlawn Elementary School. The Volunteer Fire Company's building (the firehouse) occupies the southeast quadrant. The remaining quadrant includes the first of a row of well-kept detached houses. Abutting the property to the north is the Woodlawn Cemetery. Gwynn Oak Amusement Park is on the same side of Woodlawn Drive about one-half mile northeast of the property. On both sides of Woodlawn Drive, south of Windsor Mill Road, abutting the firehouse on one side and the residential lots on the other, the Clarke Manor Apartments (220 units) are located. Abutting the property on the northwest is the development known as Maple Hill consisting of about 20 houses. The predominant classification to the northwest, west and south is R-6. Indeed, there are no commercial uses on Windsor Mill Road between Woodlawn Drive and the Beltway except three non-conforming uses, one of which is a building containing nothing but unattended dial switching gear belonging to the telephone company; the other two are a service station and a small food market. A half mile or so to the northwest of the property there are several parcels that have been reclassified from R-6 to R-A (Residence-Apartments).

Moving in an easterly direction along Windsor Mill Road, one encounters, after passing the Woodlawn Elementary School, the Woodlawn business district which was classified B-L by the adoption of the map. About a mile to the southwest is the large Security Boulevard Shopping Center, "affirmed and recognized" by the map. Other shopping areas will be found along Liberty Road which runs parallel to Windsor Mill Road a mile or more farther north.

It is now firmly established that there is a strong presumption of the correctness of original zoning and of comprehensive rezoning, and that to sustain a piecemeal change therefrom there must be produced strong evidence of mistake in the original zoning or comprehensive rezoning or else evidence of substantial change in the character of the neighborhood. *Minor v. Shiflett,* 252 Md. 158 (1969), and the cases therein cited; *Randolph Hills, Inc. v. Whitley,* 249 Md. 78 (1968); *Woodlawn Area Citizens Ass'n v. Board,* 241 Md. 187 (1966). And, of course, the burden of proof facing one seeking a zoning reclassification is quite onerous. *Agneslane, Inc. v. Lucas,* 247 Md. 612, 618 (1967), and the cases therein cited.

To support his contention that the evidence before the Board in respect of a substantial change in the character of the neighborhood made the issue fairly debatable Pierpont relies principally upon the testimony of Frederick P. Klaus whom we described, in *Bosley v. Hospital,* 246 Md. 197, 202 (1967), as "a well-qualified real estate expert." Mr. Klaus cited the widening of Woodlawn Drive (Clarke Avenue) in 1964 as the most significant evidence of change in the character of the neighborhood. The result, he said, was the movement of the center of Woodlawn from east of Gwynn Oak Avenue to the intersection of Windsor Mill Road and Woodlawn Drive. Even if his statement is correct, and quite likely it is, it has no validity in the context of the instant case. The testimony of George E. Gavrelis, Baltimore County's Director of Planning, an excerpt from which follows, is uncontradicted:

"Q. Mr. Gavrelis, at the time the land use map was adopted, was Woodlawn Drive then known as Clarke Boulevard [Avenue] located as it presently exists on

the land use map? A. Woodlawn Drive, then called Clarke Boulevard [Avenue], was in fact, shown on the Western Area Master Plan. I believe that *the location, finally constructed, was in almost precise correlation with the route shown on the map* — obviously there could have been changes within a matter of feet, when construction occurred, from the route predicted, but essentially the route predicted and the construction that occurred were about the same, with only but minor change. [Emphasis added.]

"Q. Were the Clarke Manor Apartments located on the land use map when it was adopted finally? A. The Clarke Manor Apartments, in fact, secured their apartment zoning by means of the map."

The "character of the neighborhood," as it concerns us here, was established by the map in November 1962. The map contemplated Woodlawn Drive almost precisely as it exists today just as it contemplated the erection of the Clarke Manor Apartments. It contemplated also the integrity, which has been maintained, of the R-6 classification along Windsor Mill Road west of Woodlawn Drive. Since Woodlawn Drive is the warp and woof of the neighborhood's "character" it seems idle to argue that it has been changed thereby. *Cf. Goucher College v. DeWolfe,* 251 Md. 638 (1968) ; *Bosley v. Hospital, supra.*

Mr. Klaus next cited a 22 acre tract "three blocks" west of the property (beyond the ridge), on the same side of Windsor Mill Road, which was reclassified from R-6 to R-A in June 1964. At the time of the hearing, May 1967, it was still "undeveloped." He cited also a contiguous parcel of 26 acres, to the north of Windsor Mill Road, "five blocks" from the property, which was reclassified from R-6 to R-A in November 1965. At the time of the hearing construction had begun on that parcel. We fail to see how these two rezonings can affect the "character" of the neighborhood. The map ordained the construction of apartments (Clarke Manor) within a stone's throw of the property. More apartments a quarter to a half mile away, and out of sight to boot, other than to increase the population, would seem to be inconsequential and, as we said in *County Comm'rs v.*

*Fairwinds Beach Club, Inc.,* 230 Md. 569, 572 (1963), "a mere increase in population does not prove a change in the character of the neighborhood to justify another type of zoning." *Cf. Board v. Kines,* 239 Md. 119 (1965).

A half mile or more to the northeast of the property is a 63 acre tract, on the same side of Woodlawn Drive, the near end of which has been occupied by the Gwynn Oak Amusement Park for a number of years. The amusement park was, of course, a non-conforming use at the time of the adoption of the map, at which time sections of the entire 63 acre tract were classified R-10, R-6 and B-L. In September 1964 the entire tract (63 acres) was reclassified to B-R (Business, Roadside); at the same time a special exception was granted for the amusement park use. We are urged to look upon this rezoning as significant evidence of a change in the character of the neighborhood but we are not persuaded that this is so. The reclassification to B-R, we think, is more an intensification of the B-L classification than a change in use. In any case the adoption of the map committed a good part of the tract to commercial use. Furthermore, the very fact of the granting of the special exception for the amusement park, for some years a non-conforming use, presumes a determination by the zoning authorities that the requested use would not be "detrimental to the health, safety, or general welfare of the locality involved," Baltimore County Zoning Regulations, 502.1 a, or, as expressed in *Wahler v. Montgomery County Council,* 249 Md. 62, 69 (1968), that the use specially excepted is "compatible with the residential character of the neighborhood." While we are reluctant to hold that the neighborhood actually extends as far as the amusement park, it seems fair to say that, even if it does go that far, the amusement park and the R-6, R-10 and B-L zoning were facets of the character of the neighborhood in November 1962. In our judgment the reclassification, in September 1964 to B-R, in the circumstances, had no discernible effect on the character of the neighborhood. Indeed, the B-R classification to this day seems not to have been exploited.

Several other rezonings on the west side of the Beltway were discussed but we think they are too remote to have any significance in the case at bar.

Mr. Gavrelis testified that the map sought to confine the "commercial potentials" to the shopping area on Windsor Mill Road east of Woodlawn Drive, the Security Boulevard Shopping Center and the existing "commercial activity" along Liberty Road. He testified also that, for the foreseeable future, they were entirely adequate. Pierpont himself freely conceded that "there are plenty of places" to shop in the Woodlawn area; "plenty of them * * * and room [in the commercially zoned area] for more" he added. Although Mr. Klaus admitted "there have been no commercial changes since the adoption of the map" he said he felt that "the commercial aspect of development" had not "kept up with the classifications that have occurred for other uses." However, his answer to a question on cross-examination casts some doubt on the depth of his zoning expertise and reveals a rather curious philosophy which, to be sure, is at odds with the law of zoning as it has been developed by this Court. He was asked, "Where would you say the zoning [along Windsor Mill Road] ought to stop?" He replied, "Where the economics dictate it should stop." Mr. Gavrelis pointed out also that the investment in the existing facilities in the old Woodlawn shopping area "ought not to be further diluted" by a supermarket on the Pierpont property for which there is no need.

Much is made of the fact that the firehouse, "a small, old building" in November 1962, was torn down and that, pursuant to the issuance of a special exception, a larger, modern structure was erected in its place. Our attention is directed to the new kitchen facilities which can accommodate 140 people at "crab feasts, oyster roasts and other social functions." There is also a siren. One might well ask, however, what a volunteer fire company would be without crab feasts and a siren? Pierpont thought the new firehouse was "a nice building." He contributed to the fire company, he has "never made any objection" to its activities but there have been times when he wished "that siren was in Towson instead of Woodlawn." Without doubt there has been more going on at the new firehouse than the old one was ever able to accommodate but it has not been made plain to us that the character of the neighborhood has been disturbed thereby. In any case perhaps we should assume the zoning authorities satisfied themselves before issuing the special exception that

the permitted use would be compatible with the character of the neighborhood. *Wahler v. Montgomery County Council, supra.*

Appellant produced W. B. Guy, Jr., and Bernard Willemain as expert witnesses. Mr. Willemain was of the opinion that the R-6 classification of the property should not be changed. Mr. Guy thought there had been enough evidence of change to justify a reclassification of the property to R-A, a statement from which counsel for Pierpont seems to derive much comfort but which fails of persuasion as far as we are concerned. We doubt that anything can be gained by an analysis of the testimony of either Mr. Guy or Mr. Willemain for we see nothing in the record before the Board which could have made the issue of substantial change in the character of the neighborhood fairly debatable. In short, since Pierpont has failed to sustain his "onerous" burden of proof, the order of the learned trial judge affirming the order of the Board of 6 September 1967 must be reversed.

*Order reversed.*
*Appellee to pay the costs.*

BARNES, J., dissenting:

I dissent because, in my opinion, there was sufficient evidence before the Board to make "fairly debatable" its finding that there had been sufficient change in conditions in the neighborhood to justify the rezoning of the subject property from R-6 (Residence, One and Two-Family) zone to the B-L (Business-Local) zone.

If there was "substantial evidence" before the Board to support its decision, then the issue was "fairly debatable" and we should affirm the Circuit Court's order affirming the decision of the Board. As Judge Singley, for the Court, recently stated in *Kirkman v. Montgomery County Council,* 251 Md. 273, 277-78, 247 A. 2d 255, 258 (1968), quoting with approval from the opinion of the trial court:

 " 'The "substantial evidence" test has been further defined and refined in later cases, including *Board v. Oak Hill Farms,* 232 Md. 274, [192 A.2d 761 (1963)], and *Snowden v. City of Baltimore,* 224 Md. 443, [168

A. 2d 390 (1961)]. "Substantial evidence" is held to be "more than a scintilla" and such evidence "as a reasonable mind might accept as adequate to support a conclusion" and "enough to justify, if the trial were to a jury, a refusal to direct a verdict." *Board v. Oak Hill Farms,* supra. In *Snowden,* supra, the Court said, inter alia, "The heart of the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. 'The Court may not substitute its judgment on the question whether the inference drawn is the right one or whether a different inference would be better supported. The test is reasonableness, not rightness.' Davis, [Administrative Law Treatise (1958)], Sec. 29.05, p. 139." ' "

In *Kirkman,* we held that three reclassifications of land, one, approximately 1000 feet, and the other two, approximately 6000 feet, from the property under consideration in that case, made subsequent to the adoption of the comprehensive zoning ordinance constituted substantial evidence sufficient to support the rezoning.

In the instant case, the record indicates that there are existing apartments immediately behind the properties across Windsor Mill Road from the subject property. Some two blocks west of the subject property on Windsor Mill Road, 22.47 acres of land were rezoned on June 26, 1964 (subsequent to the adoption of the comprehensive zoning map on November 15, 1962) from the R-6 zone to an R-A zone which allowed the construction of 360 apartment units on that land. To the north of the 22.47 acre tract, and contiguous to it, a 26.6 acre tract was rezoned from R-6 to R-A on November 23, 1965, allowing the construction of approximately 400 apartment units, which were under construction at the time of the hearing before the Board. The 26.6 acre tract is some three blocks from the subject property. The land of Walter J. Crismer & Son, Inc. on the west side of Swynndale Avenue, consisting of 18.5 acres, was rezoned from R-6 to R-A on January 20, 1964, and allows the erection

of 296 apartment units. This tract is approximately 3000 feet from the subject property "as the crow flies."

On September 10, 1964, 63.75 acres of land used in part for the Gwynn Oak Amusement Park and on the same side of Woodland Drive as the subject property and about one-half mile northwest of the subject property was rezoned from the R-10, the R-6 and the B-L zones to the B-R zone, with a special exception for an amusement park. Prior to this rezoning, the amusement park use was a non-conforming use; after the rezoning it became a conforming use with the entire 63.75 acre tract available for development for the uses permitted in the B-R zone. These permitted commercial uses include those permitted in a B-L zone (various types of stores, dry cleaning establishments, hand laundry employing not more than 5 persons, photographic studio, offices and office buildings) ; those permitted in the B-M zone (automobile sales rooms, billiard and pool rooms, commercial recreational enterprises, including dance halls, service garage, night clubs, pawn shops, second-hand store, theatre, including drive-in and warehouse—sales and storage) ; but also, among others, uses for a soft drink bottling establishment, motel or motor court, greenhouse, laboratory and, if 50 feet from the residential zone boundaries at the ends of the commercially zoned frontage, building materials storage and sales yard, kennel, lumber yard, stone or monument work and tire retreading or recapping.

In addition to the zoning reclassifications mentioned, all made subsequent to the adoption of the comprehensive zoning map, there have been drastic changes, *in fact,* in road conditions in the neighborhood of the subject property. When the comprehensive zoning map was adopted on November 15, 1962, Pierpont Lane, which was used as an entrance to the subject property and to a portion of Mr. Pierpont's property sold by Mr. Pierpont in 1918, was a narrow private road. Introduced into evidence was a photograph taken in October, 1962 (approximately one month before the comprehensive zoning map was adopted on November 15, 1962) which clearly indicated this narrow country road shaded on both sides by trees which in many places met overhead to form an arch. In 1964, land was acquired from Mr. Pierpont to convert this country road into

the present four lane, .48 foot paved public highway on a 70 foot right-of-way now known as Woodlawn Drive. The proposed highway was indicated on the comprehensive zoning map, approved November 15, 1962 as Clarke Avenue. Part of the Pierpont land was also acquired in 1964 for the widening of Windsor Mill Road, which is now 39 feet wide on a 55 foot right-of-way.

Mr. Klaus was of the opinion that:

"* * * the greatest impact on the subject property is that Woodlawn Drive has moved the center of Woodlawn in a northerly direction. It is a very wide street, as has been testified by the engineer, and it connects into large complexes of industry, and the Social Security operation, and by the construction of this road as a cross and feeder road, it has actually moved the traffic pattern from the old Woodlawn area to an area where the Pierpont property is."

After pointing out that Windsor Drive was constructed through the Pierpont property and that prior to that time the Pierpont property had access to Windsor Mill Road by means of a private lane, Mr. Klaus testified:

"* * * the whole pattern of movement has changed by the construction of Woodlawn Drive, and makes this property, of course, much more accessible for commercial uses than the heart of Woodlawn, which, as has been testified to, is an older area, which we have had in Reisterstown, in Cockeysville, and Towson —but by the construction of new feeder roads, business has moved toward these roads because it has much better access."

The Board, in my opinion, properly found:

"Prior to the construction of these two roads, i.e. in 1962 at the time of the map adoption, what is now Woodlawn Drive and what was then Pierpont Lane may be clearly seen on Petitioner's Exhibit No. 3-H. It would be hard to find a better example of change

in the character of roads than those surrounding Mr. Pierpont's property."

The majority indicates that because the *proposed location* of Woodlawn Drive appeared on the comprehensive zoning map, adopted November 15, 1962, Mr. Klaus' testimony in this regard "has no validity in the context of the instant case." I do not agree with this conclusion. The mere drawing of lines on a map indicating the location of a future proposed road cannot, in itself, forecast in any definitive way what will be the ultimate effect of that road upon the neighborhood if, when and as the rights-of-way are acquired, the road actually constructed, and then used by the general public under the conditions existing in the future. The *impact* upon the neighborhood and upon the individual property owner in that neighborhood occurs when the rights-of-way are *actually* acquired, the road construction *actually* takes place and the road is *then* used by the public. It is only then that it can be determined whether or not there has been a change in the character of the neighborhood as a result of the construction and use of the road. There might be no such change or there may be a change, depending upon the facts presented to the Board at the time it considers a rezoning application. In my opinion, "change in the character of a neighborhood" is a fact, not a theory. The presence of the proposed road in the zoning map is a factor to be considered by the Board but it is by no means conclusive. All of the facts presented at the hearing are relevant to the issue, and may be considered and weighed by the Board in reaching its decision. This conclusion was implicit in our decision in *Finney v. Halle*, 241 Md. 224, 216 A.2d 530 (1966), in which we held that the first and most important factor indicating a change in conditions in the neighborhood was the *construction* of the Baltimore County Beltway and its effect upon the property involved in that case. Although in *Finney*, the comprehensive zoning map, approved April 15, 1959, did not show the proposed Beltway, the Baltimore County authorities *knew at the time of the approval of the map,* the general location of the proposed Beltway. An even stronger case is *Iobar Corp. v. Rodgers Forge Community Ass'n,* 236 Md. 106, 202 A. 2d 612 (1964). In

*Jobar,* Stevenson Lane appeared on the comprehensive zoning map, approved April 15, 1955, but at that time it had not been settled whether or not that road would ever be extended to connect York Road and Bellona Avenue. At the time of the approval of the map, in 1955, Stevenson Lane was a small 12 to 15 foot road, and was, in part, a private drive. It was extended and widened in 1961 and 1962 so that at the time of the hearing before the Board, it was a fully paved 42 to 44 foot bituminous concrete road with a 70 to 80 foot right-of-way; it allowed 14 feet for traffic in each direction and became a major traffic artery between York Road and Charles Street and Bellona Avenue. The experts produced by the applicant before the Board in *Jobar* testified that this change in the character of Stevenson Lane which "perhaps more than any other land use consideration" would affect the character of the immediate neighborhood of the property involved in that case. We sustained the rezoning in *Jobar* and, in my opinion, the decision in that case should require us to sustain the rezoning in the present case in view of the close similarity between the situation in regard to the change in the character of the roads in the respective cases.

The majority discounts the effect of the rezoning subsequent to November 15, 1962, of substantial areas of land in the neighborhood from R-6 to R-A and the construction of apartments on part of the rezoned R-A land, quoting a dictum of the Court in *County Comm'rs of Anne Arundel County v. Fairwinds Beach Club, Inc.,* 230 Md. 569, 572, 187 A. 2d 845, 846 (1963), that "a mere increase in population does not prove a change in the character of the neighborhood to justify another type of zoning." It is clear, however, that an increase of population *may* under certain facts and with proper findings of the Board be an important factor in indicating a sufficient change in the neighborhood to justify a rezoning of a commercial area to care for the needs of the increased population. Indeed, this is indicated in the opinion of the Court in *Fairwinds* immediately following the quotation mentioned, where Judge (later Chief Judge) Henderson stated, for the Court:

"It was also argued that because of the increase in population a need for additional shopping facilities was

demonstrated. But there was precise testimony that shopping facilities in the neighborhood were more than adequate, and the testimony as to public need was based upon general conclusions from population figures that were not even put in evidence. The protestants argued, with some force, that the increase in shopping facilities and service stations in the area defined exceeded the increase in population. The Board made no finding of fact on this point but only a general finding that 'conditions have changed'." (230 Md. at 572, 187 A. 2d at 846)

The clear indication is that if the necessary proof had been forthcoming and if the necessary finding by the Board had been made, the result would have been different. Our later decisions indicate that a substantial change in population density in a neighborhood can be an important factor in indicating a sufficient "change in conditions" to justify a Board in rezoning a property for commercial purposes to satisfy the needs of the then existing population. As we stated in *Bosley v. Hospital for Consumptives*, 246 Md. 197, 204, 227 A. 2d 746, 750 (1967) :

"Moreover, the rezoning changes subsequent to November 1955, previously discussed, were important changes in the law and resulted in substantial changes in the character of the neighborhood even though all of the rezoning changes were to more intensive residential use by an increase in density from R-6 or R-10 to R-A. The substantial development of housing units and the concurrent growth in population could reasonably lead to need for additional commercial zoning in the area to supply the wants of the increased population. At least, reasonable men could conclude—as the Board concluded—that these changes in conditions in the area could justify the rezoning of the subject property to the B-L zone. The Courts may not substitute their judgment for that of the Board when the Board's decision is supported by substantial evidence and the issue before the Board was fairly debatable. *Vogel v. McCosh*, 242 Md. 371, 219 A. 2d 89 (1966). See *Fin-*

*ney v. Halle,* 241 Md. 224, 216 A. 2d 530 (1966) ; *Oursler v. Board of Zoning Appeals of Baltimore County,* 204 Md. 397, 104 A. 2d 568 (1954). See also *Rohde v. County Board of Appeals for Baltimore County, supra."*

These reclassifications for apartment house use were substantial. William B. Guy, Jr., an expert for the protestants, testified that there was zoning for an additional 1000 apartments of which about 700 had been built to the north and south of the subject property.

Another zoning change subsequent to the adoption of the comprehensive zoning map on November 15, 1962, was the reclassification of the 63 acre tract on the same side of Woodlawn Drive, the near end of which has been occupied by the Gwynn Oak Amusement Park for a number of years. As already has been indicated, this amusement park on November 15, 1962, was a *non-conforming use* and the entire tract had R-10, R-6 and B-L zoning classifications. On September 10, 1964, this entire tract was rezoned to B-R (Business-Roadside) and at the same time, a special exception was granted for amusement park use. The conversion of this commercial *non-conforming use,* to a *conforming use* was a significant change which had direct bearing on the "character of the neighborhood." The prevailing zoning theory is that non-conforming uses, which are incompatible with the general character of the neighborhood, will ultimately "wither on the vine" and disappear so that ultimately in the future the entire area will be in conformity with the generally established use in the neighborhood. *Minor v. Shifflett,* 252 Md. 158, 167, 249 A. 2d 159, 165 (1969) ; *Stieff v. Collins,* 237 Md. 601, 604, 207 A. 2d 489, 491 (1965) ; *Schiff v. Board of Zoning Appeals,* 207 Md. 365, 368, 114 A. 2d 644, 645 (1955) ; *Colati v. Jirout,* 186 Md. 652, 657, 47 A. 2d 613, 615 (1946). Obviously the rezoning of the R-10 and R-6 portions of the 63 acre tract to the B-R zone is a recognition by the Board that commercial development in the neighborhood is in the public interest and the granting of the special exception for the continuation of the theretofore non-conforming amusement park (thereby making it a conforming commercial use) is en-

tirely consistent with that concept and is not, in my opinion, compatible with the concept that the neighborhood is to remain and be developed as an R-6 zone. The permitted commercial uses in the B-R zone which have already been set forth, in part, are hardly compatible with the development of the neighborhood as a R-6 zone for single family houses.

There seems little doubt, in my opinion, that the 63 acre tract is within the "neighborhood," although the majority states it is "reluctant" to hold that it is. As Chief Judge Hammond aptly stated, for the Court, in *Goucher College v. DeWolfe*, 251 Md. 638, 644, 248 A. 2d 379, 383 (1968) :

> "The matter of the reaches of a neighborhood in a given case and how near a change must be to affect its character are primarily for the Board to determine."

In the present case, the Board determined that the changes mentioned above were within the reaches of the neighborhood and affected its character. It is clear to me that the Board was correct in these determinations. At least, the determinations were "fairly debatable."

The Board properly considered that the 63 acre tract was within the "neighborhood" and our prior decisions indicate that it was correct in so doing. See *Kirkman v. Montgomery County Council, supra.*

The substantial addition to the firehouse building subsequent to the adoption of the comprehensive zoning map with its new kitchen facilities and larger facilities for social functions is an additional factor the Board could properly consider in reaching its conclusion that there had been a change in the character of the neighborhood in question. Instead of a "small, old building" there is a larger modern structure which can be and is now used for "crab feasts, oyster roasts and other social functions." Many of the objectionable features of the use of the newly constructed facilities at the firehouse did not exist when the comprehensive zoning map was adopted on November 15, 1962. The increased noise and traffic resulting from these new activities do indeed, in fact, change the "character of the neighborhood" and give that neighborhood a commercial, rather than a residential, character.

In my opinion, a closer look at the testimony of William B. Guy, Jr., an expert who testified for the protestants, should be taken.

In the first place, Mr. Guy, who is a well qualified real estate expert, *agreed* with Mr. Klaus that the *neighborhood* (but not the particular block) had a "mixed character." He stated: "There had, admittedly, been a number of changes in the neighborhood." In essence, it was his opinion that the changes in the neighborhood justified a rezoning classification, from the existing R-6, but he was of the opinion that the rezoning should be R-A instead of B-L. He stated in his testimony:

> "I think it would be very hard to make an argument against the rezoning of this to apartments, to R-A, in view of the fact apartments were constructed about a half a block away, and there was a change, and there have been other changes.
>
> "Q. (Mr. Parker [a member of the Board]) On a tract this size, 2.32 acres, for apartments? A. I think it could be developed in apartments. I wouldn't feel that it was bad zoning to put apartments here.
>
> "Q. (Mr. Baldwin [a member of the Board]) Do you feel that the present R-6 zoning is incorrect? A. I don't think it was incorrect when the map was produced, *but the changes that have been made in the neighborhood might make it incorrect now, yes. There have been some changes. I think the street itself is a change, admittedly, and the apartments, also,* which have been cited previously." (Emphasis supplied)

On cross-examination, he stated:

> "Q. (Mr. Harrison) You felt it was enough change to make the present zoning incorrect, and the only question is whether it should be zoned B-L or should be zoned R-A, is that correct? A. Yes, sir."

Secondly, Mr. Guy stated that in his opinion there was insufficient parking at the center of Woodlawn, stating:

> "I think it is self-evident the parking in the center of Woodlawn is not sufficient by modern standards."

Finally, a comparison of the photographs of October 1962, showing the rural, bucolic character of the subject property at Pierpont Lane at or about the time the comprehensive zoning map was adopted, with the photographs showing the same location today can hardly fail, in my opinion, to indicate clearly and conclusively that the present urban, high-speed character of the neighborhood represents a substantial change in the character of the neighborhood, justifying the rezoning of the subject property from the R-6 to the B-L zone.

The Board filed a comprehensive and well-considered opinion indicating that there had been sufficient evidence of a substantial change in the neighborhood and that the application for B-L rezoning should be granted. This decision was affirmed by the Circuit Court which also filed a comprehensive and well-considered opinion, reviewing our prior cases and holding that the question was at least "fairly debatable." It properly, in my opinion, affirmed the decision of the Board. I would affirm.