## THE HOWARD RESEARCH AND DEVELOPMENT CORPORATION *v.* ZONING BOARD OF HOWARD COUNTY ET AL.

[No. 57, September Term, 1971.]

*Decided November 11, 1971.*

---

*Motion for rehearing filed December 10, 1971; denied December 13, 1971.*

The cause was argued before BARNES, MCWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*John Harris Gurley,* with whom were *Thomas A. Garland* and *George A. Shehan* on the brief, for appellant.

*Robert F. Fischer, County Solicitor,* for Zoning Board of Howard County, part of appellees. *John C. Evelius,*

with whom was *Reginald D. Malloy* on the brief, for James Gamber et al., other appellees.

McWILLIAMS, J., delivered the opinion of the Court.

Our present concern is a 1.27 acre tract (the property) in the Second Election District of Howard County lying on the north side of State Route 108 about 600 feet west of its junction with Old Annapolis Road. The property, part of an old subdivision known as "Columbia Woodlands," consists of nine lots each fronting 25 feet on Route 108. The easternmost lot (#34) is 185 feet deep; descending numerically the lots increase in depth; the westernmost (#26) is 280 feet deep. Lot 34 was acquired by Gamber in 1948. Lots 31, 32 and 33 were acquired by Ketterman in 1945. Lots 26, 27 and 28 were acquired by Young in 1945; in 1946 he acquired 29 and 30. The Allview Golf Course was on the opposite side of Route 108. It is still there but now it is a part of Columbia, the 14,000 acre New Town developed by the appellant (HRD). *Bowie v. Board of County Comm'rs of Howard County,* 253 Md. 602 (1969).

Despite the rather thin record it seems a fair surmise that the property and all of the land for a mile or so around it was placed in the R (Residential) classification in 1948 when zoning regulations were first adopted in Howard County. At that time the lot at the junction of Route 108 with Old Annapolis Road, about 500 feet east of the property, was "occupied by a store and filling station." In 1956 that lot, always recognized as a nonconforming use, was reclassified from R to B-2 (General Commercial Area). It is known now as the "Allview Bar."[1] Four years later (1 July 1960) the Planning Commission (now the Planning Board) of Howard County adopted a Master Plan suggesting the continuation of the property and the surrounding land in a new and more restricted residential classification (R-20). The

1. A mile or so west of the property there is another bar on the south side of Route 108. This is conceded to be a nonconforming use.

only variation in the plan from the 1948 zoning concerned a tract of about 25 acres on the north side of Old Annapolis Road for the greater part of which apartments were recommended; for the balance commercial uses were suggested. In 1961 the County Commissioners adopted and promulgated the "Generalized Zoning Map of Howard County" which, in the main, reflects the Planning Commission's recommendations; a notable exception is the 25 acre tract designated for apartment and commercial uses. The Commissioners, by adopting the Zoning Regulations, placed the property and *all* (including the 25 acre tract) of the land around it, except Allview Bar, in the R-20 classification. The Master Plan, as it was in 1969, reflects little, if any, change from the original plan.

Columbia was launched in August 1965 when the County Commissioners placed HRD's 14,000 acres in the "New Town" classification. As we have indicated Route 108 is the northern boundary of Columbia. It seems to be agreed that the golf course will continue to be used as a golf course but that apartments and town houses may be built around the fairways.

Whether it was in 1968 or 1969 we cannot say but there came a time when the appellees Gamber, Ketterman and Young contracted to sell the property to Mobil Oil Corporation. A clause in the contract made settlement contingent upon the reclassification of the property to B-2. The Planning Board considered the petition for reclassification in September 1969. Its findings, in part, were that the classification applied for was not in accord with the General Plan, that the sight distance for traffic moving in an easterly direction on Route 108 "is only fair," that public water and public sewer "are available" and that except for the Allview Bar "which has existed for years," the general area is residential. The Board concluded the B-2 zoning to be unnecessary and "not in the best interests of the immediate neighborhood or the County" and that it might result in a "strip commercial zone along Route 108." The Planning Board recom-

mended to the Zoning Board that the application be denied. Soon thereafter the case came on for a hearing before the Zoning Board. Apparently basing its decision upon the testimony of Campbell V. Helfrich, a broker and appraiser, about which we shall have more to say, the Zoning Board made the findings of fact which follow:

"(a) There has occurred a substantial change in the character of the neighborhood since the adoption of the original comprehensive zoning map and this change is sufficient to justify the reclassification of the subject property to a B-2 use.

"(b) That the subject property is part of an old subdivision which is not in accordance with the General Plan of Howard County.

"(c) That the road pattern is adequate, the reclassification sought is an appropriate use of the land, and the reclassification of this parcel will stabilize the adjacent property values.

"(d) That the reclassification of the subject property to a B-2 use will best serve the purpose of promoting the health, safety, morals, and general welfare of the community, and the use of the subject property in B-2 will best serve the population of the surrounding area.

"(e) That the granting of the Petition and the reclassification of the subject property will not adversely affect the surrounding neighborhood and is not inconsistent with the general plan of development of the neighborhood."

The only evidence of change mentioned in the Board's opinion had to do with "the advent of New Town [Columbia] and its present development; the relocation, dualizing, and limitation of access on U. S. Route 29; and the acquisition of Centennial Park."

"Aggrieved" by the Zoning Board's decision HRD filed its appeal in the Circuit Court for Howard County

early in December 1969. Shortly thereafter Gamber, Ketterman and Young intervened. In July 1970 the case came on for a hearing before the trial judge, Mayfield, J. On 11 March 1971 he affirmed the decision of the Zoning Board. In his opinion he said:

> "This court, having reviewed the proceedings, read the transcript of the testimony taken before the Zoning Board of Howard County, and having considered the exhibits filed by the parties, finds that *the issue before the Board was fairly debatable* and [its action] was not arbitrary, capricious and illegal. Having so found, this court may not substitute its judgment for that of the zoning authority. *Wier v. Witney Land Company, supra* [257 Md. 600]." (Emphasis added.)

Judge Mayfield did not state the issue he found to be fairly debatable. However we shall assume it was whether there was any evidence of a substantial change in the character of the neighborhood. Indeed it could hardly have been anything else.

If there is any such evidence it must be found in the testimony of Helfrich since no other witness had anything whatever to say about it. We shall discuss the events and circumstances Helfrich thought effected a substantial change in the character of the neighborhood. We should first observe, however, that no one undertook to establish the limits of the neighborhood.

The record is silent in respect of just when the water main was laid in front of the property in Route 108. Nor is there anything which tells us when the sewer line was placed in the bed of the Little Patuxent River, 1,200 feet west of the property. So we shall assume it was all subsequent to 1961 and that both services are available to the property. Without doubt these are changes, perhaps even substantial changes, but it is absurd to say, as did Helfrich, that either or both of them brought about any change in the character of the neighborhood. The ad-

vent of utilities such as these is more likely to amount to an affirmation of the residential character of the neighborhood and perhaps even a guaranty of sorts that it will remain so. We have held that an improvement in water and sewerage facilities, standing alone, should not be taken as a change of conditions affecting the neighborhood. *Chatham Corp. v. Beltram,* 252 Md. 578, 585 (1969); *France v. Shapiro,* 248 Md. 335, 343 (1968).

Helfrich next cites as evidence of change the placing of the golf course on the south side of Route 108 in the "New Town" classification. As has been said the golf course will remain but at some time in the future apartments and "Townhouses" may be built around the fairways. Just how this could attenuate the residential character of the neighborhood neither Helfrich nor the zoning commissioners have undertaken to say. As we said in *MacDonald v. Board of County Comm'rs for Prince George's County,* 238 Md. 549, 556 (1965), we think either eventuality would be "a continuation and solidification" of the existing residential character of the area.

Pursuant to the authority granted by Chapter 450 of the Laws of Maryland of 1961 to the counties embracing the "Patuxent River Watershed," the County Commissioners of Howard County by 1969 had acquired some 200 to 300 acres of land on either side of the Little Patuxent River, nearly all of which is on the north side of Route 108, about one-half mile west of the property. The tract is known as "Centennial Park." The acquisition of such areas in the Patuxent River Watershed and their development as parks providing citizens with "recreational activities such as sailing, boating, fishing, hiking and horseback riding," are recommendations to be found in the Master Plan of 1960. Surely Helfrich could not have been serious in advancing the acquisition of Centennial Park as evidence of a change in the character of the neighborhood, particularly a change in the direction of a commercial use.

The final bit of evidence cited by Helfrich is the fact that for some time prior to 1965 the State Roads Com-

mission had been considering relocating Old Annapolis Road so that its juncture with Route 108 would form a right angle rather than an acute angle. A plat issued by the Commission in mid-December 1965 shows (relocated) Old Annapolis Road as being perpendicular to Route 108 about 600 feet west of the present junction of those roads. Parts of both the Gamber and Ketterman lots would have been taken to accomplish the relocation. Even if it had taken place or even if it was certain of accomplishment in the future we cannot see how the character of the neighborhood would be affected thereby. But a determination in this regard is not required of us because there is nothing in the record to show that the relocation is in any of the Commission's plans or that any funds have been appropriated or are available for such a project. In short there is no evidence that the relocation of Old Annapolis Road is "reasonably probable of fruition in the foreseeable future." *Chapman v. Montgomery County Council,* 259 Md. 641, 649 (1970), and the cases there cited.

The Zoning Board seems to have attached some significance to "the relocation, dualizing and limitation of access on U. S. Route 29," which is about 1,200 feet east of the property. In what way these could have affected the residential character of the neighborhood we cannot say for the quite simple reason that there is nothing in the record bearing on the question. Even if there were, however, we think it is clear that the Master Plan and the Zoning Map both contemplated certain changes in U. S. Route 29. The plan suggests an interchange at this point and the addition of a lane for northbound traffic. No relocation was suggested and, except for the new northbound lane, there seems not to have been any. The zoning map reveals no inconsistencies. We understand, however, that a fullblown interchange, at least at this writing, has not materialized. It seems fair to say that whatever change has taken place is entirely consistent with the changes contemplated by the Planning Commission in 1960. *Surkovich v. Doub,* 258 Md. 263, 273

(1970) ; *Wells v. Pierpont,* 253 Md. 554, 558 (1969) ; *Chatham Corp. v. Beltram, supra* at 585 ; *Randolph Hills, Inc. v. Whitley,* 249 Md. 78, 86 (1968).

Where, as here, the record is so devoid of substantial supporting facts as to be incapable of raising a debatable issue, we have not hesitated to declare invalid the action of the zoning agency. *Heller v. Segner,* 260 Md. 393, 399 (1971) ; *Wells v. Pierpont, supra; Wahler v. Montgomery County Council,* 249 Md. 62, 71 (1968) ; *Helfrich v. Mongelli,* 248 Md. 498, 505 (1968) ; *Baker v. Montgomery County Council,* 241 Md. 178, 186 (1966). We think the learned trial judge should have reversed the action of the Zoning Board.

> *Order reversed.*
> *Costs to be paid by the appellees.*