MAYOR AND CITY COUNCIL OF BALTIMORE *v.*
ELMER BRUCE

[No. 84, September Term, 1980.]

*Decided October 15, 1980.*

The cause was argued before MELVIN, LISS and MACDANIEL, JJ.

*John N. Spector, Assistant City Solicitor for Baltimore City,* with whom was *Benjamin L. Brown, City Solicitor for Baltimore City,* on the brief, for appellant.

*Barbara Gold* for appellee.

LISS, J., delivered the opinion of the Court.

This is an appeal by the Mayor and City Council of Baltimore, appellant, from a judgment entered by the Baltimore City Court which reversed, on appeal, a decision of the Board of Municipal and Zoning Appeals (the Board) and directed the Board to permit the use of property owned by Elmer Bruce, appellee, as requested by the appellee.

On July 11, 1979, the appellee filed a permit application with the Construction and Buildings Inspection Division of the Department of Housing and Community Development in which he sought to use a brick building located at 1219 Hull Street in the Locust Point area of the city as a machine shop. The permit application was denied on July 12, 1979, and on that same day the appellee filed a notice of appeal and an appeal to the Board of Municipal and Zoning Appeals. On September 11, 1979, the Board heard and denied the appeal. Appellee appealed to the Baltimore City Court, and after a hearing, the Court (Kaplan, J.) reversed the Board and directed it to issue a permit authorizing the property to be used for the purpose recited in appellee's original application. The Mayor and City Council filed a motion for a new trial which, after a hearing in open court, was denied. The appellant then filed the instant appeal by which it raised the following issues:

1. Whether the Baltimore City Court erred in holding

that the clear definition of the word "use" in the Baltimore City Zoning Ordinance required the conclusion that the Board of Municipal and Zoning Appeals was wrong in limiting the definition of "a structure all or substantially all of which is designed and erected for an industrial use" to buildings that were originally designed, erected for, and used for industrial purposes.

2. Whether the Court erred in not applying the "substantial evidence" or "fairly debatable" test to the decision of the Zoning Board?

1.

The property here involved is located at 1219 Hull Street in Baltimore City. The structure located on the land is a one-story masonry building containing approximately 5000 square feet of floor space. The building was erected about forty years ago by the International Longshoreman's Union Local 829, and for the next four decades it has been used as a union and hiring hall. From the time of its erection, until 1971, the property was zoned for industrial use. The operation of a machine shop was a permitted use in an industrial zone under the then effective zoning ordinance. On April 20, 1971, the Mayor and City Council adopted a new comprehensive zoning ordinance [1] by the terms of which 1219 Hull Street was classified as being in a residential zone. There is, at least, a suggestion that this was in the nature of "spot zoning" as a property immediately across a rear alley from the property in question was permitted to retain its industrial classification. It is to be noted that the operation of a machine shop would not be permitted in a residential zone under the circumstances of this case unless it was permitted as a non-conforming use.

Section 8.0-1 of Article 30 of the Baltimore City Zoning Ordinance provides: "Any non-conforming use or structure, or any non-complying structure, may be continued, subject to the regulations of this chapter."

1. Baltimore City Zoning Ordinance (1979) appearing as Baltimore City Code (1966 Ed.) Article 30, Chapter 8.

Section 8.0-3 of Article 30 regulates non-conforming structures and their uses as follows:

8.0-3 Non-conforming structures and uses thereof (CLASS 2)

This section is confined to the regulation of non-conforming structures and uses thereof, which structures and uses shall be known as Class 2.

a. Class 2 non-conforming structures and uses thereof shall include any structure all or substantially all of which is designed and erected for a use not permitted in the district in which it is located, and the uses thereof, including any non-conforming use of land accessory thereto.

\* \* \*

d. Change. In Residence and Office-Residence Districts, a Class 2 non-conforming use shall not be changed to any other non-conforming use — except that the Board, in accordance with the authority and procedures established in Section 8.0-7 of this chapter, may authorize a change of a Class 2 non-conforming use which is located in a structure all or substantially all of which is designed and erected for an industrial use to a use permitted in the M-1 Industrial District. Where a Class 2 non-conforming use is located in a structure all or substantially all of which is designed and erected for a business or other non-conforming use, the Board, in accordance with the authority and procedures established in Section 8.0-7 of this chapter, may authorize a change of such Class 2 non-conforming use to a use listed in the B-1 Neighborhood Business District.

In B-1, B-2, B-3, B-4, B-5, M-1, M-2, and M-3 Districts, a Class 2 non-conforming use shall not be changed to any other non-conforming use — except that the Board, in accordance with the authority and procedures established in Section 8.0-7 of this

chapter may authorize a change of a Class 2 non-conforming use to another non-conforming use which is similar in nature and character to the existing non-conforming use.

When a non-conforming use has been changed to a conforming use, it shall not thereafter be changed back to a non-conforming use.

Article 30, Section 8.0-7 governs the exercise of authority by the Board over changes, alterations and extensions of non-conforming uses and structures subject to the following standards and limitations:

The Board, after public notice and posting, may determine and authorize such changes, alterations, and extensions to non-conforming uses and structures, and may authorize the continuance of non-complying dwelling units in non-complying structures, in harmony with the purpose and intent of this ordinance, only in the specific instances set forth herein, where the Board makes findings of fact in accordance with the guides, standards, and limitations hereinafter prescribed and, further, finds that such authorization will not be contrary to the public interest.

a. Application. An application for any such change, alteration, extension, or continuance shall be filed with the Zoning Administrator, on a prescribed form. The application shall be accompanied by such plans and data as required by the Board pursuant to general rule.

b. Changes, alterations, and extensions to non-conforming uses and structures, and continuance of non-complying structures, shall be in accordance with the guides, standards, and limitations established in this chapter, and may be granted by the Board only in the following instances, and in no others:

1. to authorize a change on a non-conforming use`

as limited and stated in Sections 8.0-3d and 8.0-4d of this chapter, provided that the Board shall first find in each case that:

(a) any emission of noise, vibration, smoke or particulate matter, toxic matter, odorous matter, fire or explosion hazards, or glare resulting from the proposed use would be no greater than those of the existing or last use of the property; and

(b) the new use will not generate a greater volume of traffic than the existing or last use of the property; and

(c) the proposed use will not occupy a greater portion of the lot and/or structure than the existing or last use of the property; and

(d) the effect of the new use on the health, safety, or general welfare of the community shall be no greater than the existing or last use of the property.

The Board, after hearing this case, adopted a resolution which said, in pertinent part:

In residence and Office Residence Districts, a Class II non-conforming use shall not be changed to any other non-conforming use except that the Board, in accordance with the authority and procedures established in Section 8.0-7 of this Chapter, may authorize a change of a Class II non-conforming use which is located in a structure all or substantially all of which is designed and erected for an industrial use to a use permitted in the M-1 Industrial District. Where a Class II non-conforming use is located in a structure all or substantially all of which is designed and erected for a business or other non-conforming use, the Board, in accordance with the authority and procedures established in Section 8.0-7 of this

Chapter, may authorize a change of such Class II non-conforming use to a use listed in the B-1 Neighborhood Business District. A machine shop is listed as a permitted use in the M-1 Industrial District.

\* \* \*

The Board went on to say:

The Board, after having given due regard and consideration to the nature and condition of the adjacent uses and structures and the facts in this case, is of the opinion that the machine shop should not be allowed. The Board does not accept the appellant's attorney's position that if a building is designed and erected for an industrial use and not used for industrial purposes, it still may be changed to a use permitted in an M-1 District. The Board finds that if a building is designed and erected for an industrial use, it must be used for industrial purposes, without interruption, otherwise it is without the authority to change the use to a machine shop or any other M-1 use. The Board further finds that even if it accepted the fact espoused by the attorney representing the appellant that it still would generate more people and have an adverse impact on the community while at the same time disrupting a very stable, residential neighborhood. The Board feels that the proposed use would not minimize the objectionable impact and finds as a fact that the traffic would be increased and the use would adversely affect the community. The Board cannot accept the legal premise offered by the appellant nor was any compelling reason shown to exercise its discretion so as to allow the machine shop in this community.

In accordance with the above facts and findings, the Board disapproves the application.

Both the appellant and the appellee agree that the determination of the controversy in this case is based on the right of the Board to exercise its discretion to permit the use contemplated by the appellee. The record before the Board clearly established that the building at 1219 Hull Street had been designed and erected as an industrial building. There was detailed testimony that the building contained a solid concrete floor, heavy duty heating and wiring and commercial windows and a facade. The Board refused, however, to exercise its discretion to allow the appellee to use the building for an industrial purpose on the basis that in order for the Board to make an exception under Sections 8.0-7 and 8.0-3d of the zoning ordinance there was the requirement that *the structure must have been continuously used for an industrial use* similar to the proposed machine shop.

On appeal to the Baltimore City Court the presiding judge reached a contrary conclusion. In his oral opinion, he found as follows:

> The Board may permit an exemption where what is involved is a structure, all or substantially all of which was designed and erected for an industrial use. The key words are "designed and erected for an industrial use." The Board concluded that that means that the building must have been designed for, erected for, and used by an industry, such as an automobile manufacturer or any other kind of industry. The Board concluded that does not mean that the building today, if looked at, can be used for or is suitable for industrial purposes. I would have no trouble in finding that the Board was correct in their interpretation of this language but for the language in Paragraph 87 of the law defining the term "use" [2] because the phrase that was discussed, "designed and erected for industrial use," ties into

---

**2.** Paragraph 87 of the Baltimore City Zoning Ordinance defines *use* as follows: "Any purpose for which a building, other structure or tract of land may be used or occupied. Also, any activity, occupation, business or operation carried on, or intended to be carried on, in a building or other structure or on a tract of land."

> the definition of use and that, as previously indicated, means *any purpose for which a building or other structure or a tract of land may be used or occupied.*
>
> Well, obviously, there is no dispute that this building today is suitable for industrial use, though it was not designed or erected for an industrial purpose or used for the same, and there is also no dispute that it was originally designed and was erected and was used as a Union Meeting Hall. But the definition of "use", when tied into that language, seems to me to require the conclusion that the Board was wrong in so limiting the definition to buildings that were originally designed, erected for and used for industrial purposes.

It seems clear to us that the provisions of Sections 8.0-3d and 8.0-7 were specifically included in the zoning ordinance to provide an opportunity for the Board to protect the legitimate interests of the owners of a non-conforming building or a non-conforming tract of land. Under the zoning ordinance adopted in 1971, the Zoning Board was granted the discretionary power to authorize a Class 2 non-conforming structure (the union hall) to be changed to a non-conforming use permitted in an M-1 industrial district (the machine shop). The change, as authorized, was subject to the standards set out in Section 8.0-7. The record here establishes that the building in this case was originally erected in an industrial zone and that when it was erected it was designed and built so that it might be put to an industrial use. The building remained in an industrial zone for almost four decades. The structure was declared to be in a residential zone by reason of the adoption of the new zoning ordinance in 1971. The building continued to be used as a union hall until 1979 when the present proceedings were instituted.

The Board was bound to consider the entire ordinance in determining what the Board's powers were in the instant situation. Further, it was bound by the legislative definition

of the word "use" as defined in the statute which would not permit the Board to construe such a word according to its meaning in common parlance where that meaning differs from the legislative definition. 101 A C.J.S. *Zoning and Land Planning* Section 103 at 375 (1979). The rule of statutory construction is clear that in ascertaining the intention of a legislative body all parts of a statute must be read together and all parts are to be reconciled and harmonized if possible. *Thomas v. State,* 277 Md. 314, 353 A.2d 256 (1976); *Kadan v. Board of Supervisors of Elections,* 273 Md. 406, 329 A.2d 702 (1974). All parts of the statute must be read together so that no part becomes superfluous. *Employment Security Administration v. Weimer,* 285 Md. 96, 400 A.2d 1101 (1979); *Condominium Owners v. Supervisor of Assessments of Baltimore County,* 283 Md. 29, 388 A.2d 116 (1978).

We agree with the trial judge that the Board erred in selecting the meaning of the word "use" which appeared to it to be most reasonable under the circumstances. In the light of the clear and unequivocal definition of "use" set out in the zoning ordinance, the Board was bound to accept that definition as the intended meaning of that word. *See* 1 Rothkopf, *The Law of Zoning and Planning* Section 9.03; *Hunt v. Montgomery County,* 248 Md. 403, 237 A.2d 35 (1968); *Nooe v. City of Baltimore,* 28 Md. App. 348, 345 A.2d 134 (1976).

While the Court of Appeals has established that where land alone is involved a mere intention to use it is not enough to establish a non-conforming use, we call attention to the fact that this case does not involve non-conforming land use. *See Chayt v. Board of Zoning Appeals,* 177 Md. 426, 9 A.2d 747 (1940). The appellant concedes that the Board had evidence before it that the structure on Hull Street was adaptable to the use requested by the appellee. We hold that the Board had the discretionary power to consider and grant the relief sought by the appellee and find that the Board erred in holding that under the law it had no such discretion.

## 2.

It seems clear to us that the Board adopted conflicting positions in reaching its decision in this case. The Board initially decided that it had no discretion to grant the permit sought by the appellant. The Board then decided that there was no evidence from which it could have found that the building here involved was designed and erected for industrial use. This conclusion was reached in the face of uncontradicted testimony that the building was of an industrial type, containing 5000 feet of solid concrete floor arranged as one room with offices. The witnesses stated that the building had a heavy duty wiring system, and a heavy duty heating plant. Further, the windows of the building were described as heavy duty wire type industrial windows. In addition, it was stated that the subject property had an industrial commercial facade on the front of the building. The testimony further described the structure as having fireproofed solid brick walls and that it was constructed as a multi-purpose building.

The Board then found that the use for the building proposed by the appellee would cause "traffic problems and other environmental and physical problems which would adversely affect the community." That determination was based entirely on an opinion expressed by a neighbor located several houses from the property at 1219 Hull Street. The record is devoid of any factual basis for this finding by the Board. The trial judge accurately assessed the weight of that testimony when he said in his oral opinion:

The only evidence, if it can be called evidence, in the record is a conclusion of one individual who was not an expert in traffic matters or noise or pollution or, for that matter, anything. In any event, he said he believed the proposed use would cause these problems. Then the Board, based on that testimony, concluded that the Board feels that the proposed use would not minimize the objectionable impact and finds, as a fact, traffic would be increased and the

> use would adversely affect the community. Of course, the same use that was proposed for the Union Hall by the appellant, of which the Board had evidence, was the same machine shop operation which appellant carries on a couple of blocks down the same street. There was no evidence that at its present location, the machine shop is causing any difficulties or any damage to the community. In fact, the evidence was to the contrary.

Appellant urges that the trial court below erred in not applying the substantial evidence or fairly debatable test to the decision of the Zoning Board. In a recent case before the Court of Appeals, *Cicala v. Disability Review Board,* 288 Md. 254, 418 A.2d 205 (1980), Judge Davidson discussed the trial court's function in reviewing the findings of an administrative agency. The Court stated that one of the issues to be determined on review is whether an administrative agency has acted arbitrarily and that "[o]ne of the ways in which an administrative agency acts arbitrarily is to reach a decision which is not based upon or supported by facts in the record." *Id.* at 260. A reviewing court may not substitute its judgment for that of the administrative agency. *Mayor of Annapolis v. Annapolis Waterfront Co.,* 284 Md. 383, 396 A.2d 1080 (1979); *Marek v. Baltimore County Board of Appeals,* 218 Md. 351, 146 A.2d 875 (1959), but rather, it is restricted "to a determination whether, based upon the record, a reasoning mind could have reasonably reached the factual conclusion reached by the administrative agency." *Id.*

Where, however, as in this case, the record is devoid of evidence sufficient to raise a debatable issue, a reviewing court has the implicit power to declare a finding of a zoning administrative body invalid. *See Howard Research and Development Corp. v. Zoning Board of Howard County,* 263 Md. 380, 283 A.2d 150 (1971); *Heller v. Segner,* 260 Md. 393, 272 A.2d 374 (1971); *Wells v. Pierpont,* 253 Md. 554, 253 A.2d 749 (1969).

For these reasons we affirm the decision of the trial court in the present case.

*Judgment affirmed, costs to be paid by appellant.*